Filed 6/23/14  P. v. Butler CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>MARC DAVID BUTLER,<br><br>    Defendant and Appellant. | F065030<br><br>(Super. Ct. No. BF133681A)<br><br>**OPINION** |

-ooOoo-

## THE COURT[*]

APPEAL from a judgment of the Superior Court of Kern County.  John R. Brownlee, Judge.

Hassan Gorguinpour, under appointment by the Court of Appeal, for Defendant and Appellant.

Office of the State Attorney General, Sacramento, California, for Plaintiff and Respondent.

-ooOoo-

---

[*]    Before Cornell, Acting P.J., Kane, J., and Poochigian, J.

A jury convicted appellant, Marc David Butler, of elder abuse (Pen. Code, § 368, subd. (b)(1);[1] count 1) and assault by means of force likely to produce great bodily injury (§ 245, subd. (a)(1); count 2), and found true enhancement allegations that in committing each offense appellant personally inflicted great bodily injury on a non-accomplice (§ 12022.7, subd. (a)). The court imposed a prison term of seven years, consisting of the four-year upper term on the count 1 offense plus three years on the accompanying enhancement. On count 2 the court imposed, and stayed pursuant to section 654, an identical seven-year prison term.

Appellant's appointed appellate counsel has filed an opening brief which summarizes the pertinent facts, with citations to the record, raises no issues, and asks that this court independently review the record. (*People v. Wende* (1979) 25 Cal.3d. 436.) In response to this court's invitation to submit additional briefing, appellant has submitted a letter in which he raises various claims which we discuss below.[2] We affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

*Facts – Prosecution Case*

Glenda Rettick testified that in September 2010, appellant, who Rettick had known for approximately 16 years, was living in her house, paying no rent but working for her as a handyman.[3] Rettick was 69 years old at the time, and she had told appellant her age more than once.

---

[1] All statutory references are to the Penal Code.

[2] In his letter, appellant also requested time to submit additional briefing. This court granted that request. Appellant, however, has not responded, and the time granted by this court to submit additional briefing has expired.

[3] Except as otherwise indicated, the "Prosecution Case" portion of our factual summary is taken from Rettick's testimony.

On the morning of September 2, 2010 (September 2), Rettick asked appellant to go with her to the food bank to help her carry the box of food she intended to get for the two of them. Appellant asked Rettick for money to buy beer, Rettick refused the request, and appellant said, "I've done a lot of work for you." At that point, Rettick left her house and, after first going to the food bank, went to her bank to get $20 for appellant.

She returned home at approximately 5:00 p.m., and was in her bedroom, sitting on her bed watching television, when she heard a sound "like a bang." Shortly thereafter, appellant ran into Rettick's bedroom, punched her in the face, grabbed her arm, held her down, punched her four more times, and then ran out of the room. At that point, Rettick got up, locked her bedroom door and called 911. When Kern County deputy sheriffs arrived, Rettick, fearing that appellant was in the living room, crawled out of her bedroom window and went outside to meet them.

Kern County Deputy Sheriff Jay Heisey testified to the following. Shortly after 5:00 p.m. on September 2 he went to Rettick's house where, while speaking with another deputy who had arrived on the scene, he saw Rettick crawl out of a window and approach. She had "[b]lood and bruising" on her face and she stated appellant had hurt her. At that point Heisey and another deputy entered the house and found appellant, his eyes closed, lying on the couch.

Heisey further testified to the following. As he was handcuffing appellant and leading him out of the house, appellant said he "hit [Rettick], but she pulled a knife on [him]," Rettick had "held" appellant in the house "against [his] will," and "she got what she had coming." Heisey led appellant to his patrol car and "advise[d] him of his *Miranda* rights,"[4] at which point appellant stated the following. Rettick had asked him to go to the food bank and he had refused. Rettick grabbed a knife from a drawer in the

---

[4]     See *Miranda v. Arizona* (1966) 384 U.S. 436.

3

kitchen and "brandished" it. Appellant told her he knew she was not going to stab him, but he told her, "if you do that again I'll punch you." He then "punched her good" three times.

An emergency room physician at Kern Medical Center (KMC) testified he treated Rettick at KMC on September 2, at which time she had bruising and bleeding on her face, her forehead was "significantly swollen," and she had suffered a concussion and a broken nose.

*Facts – Defense Case*

Appellant testified he moved from Santa Clara to Rettick's house in December 2009.[5] Rettick "was supposed to pay [him] to do that" and she promised to give him $50 and a bus or train ticket back to Santa Clara "any time [he] wanted to [go]." Appellant and Rettick had had an "off and on" romantic relationship for approximately 16 years.

On the morning of September 2, Rettick asked appellant to accompany her to the food bank, but appellant, who was an alcoholic and was experiencing "withdrawals," asked if she would stop at a store and buy beer. Rettick refused, appellant said he would not go with her, and the two argued. Appellant "had a warrant from Santa Clara County," and Rettick, who on occasion would use this fact as "leverage," said, "you better go or I'm going to call the police." Appellant continued to refuse to accompany Rettick to the food bank, she began "screaming and yelling," and appellant told her he had "already called the FBI" and reported she had illegally obtained government benefits. At that point, Rettick "stormed out" of the house.

Appellant then walked to the house of a man he was acquainted with who lived a short distance away, to drink and to try to get the man to help him return to Santa Clara.

---

[5] Appellant was the sole defense witness. The "Defense Case" portion of our factual summary is taken from his testimony.

4

Appellant "couldn't get him to help," and he returned to Rettick's house at approximately 4:00 p.m. He was in the kitchen when Rettick came in and began angrily berating him for "call[ing] the FBI." She then struck him several times with a flyswatter and began slapping and hitting him with her hands. Appellant made his way to the living room, where he lay on the couch.

Approximately two minutes later, Rettick entered the living room, "wielding" a steak knife and pointing the blade at appellant. She said, "I could kill … you while you're sleeping at night and call the police and tell them a homeless man broke into my house." Appellant "rolled [him]self into a ball" on the couch and after three or four minutes, Rettick walked to the kitchen, put the knife down, and then went to her bedroom. At that point, it occurred to appellant, who was afraid that Rettick would kill him, that if he punched her she would be "afraid to try to do anything" and she would call the police. Appellant did not want to call the police himself because he "ha[d] a warrant," but he "need[ed] the police to come and get [him] out of there." He also believed that Rettick "deserve[d]" to be punched because she had threatened him. So, he went to the bedroom, lay down beside Rettick on the bed, and hit her three times. Two of the blows were "like, taps" and "the third [he] did hit her kind of hard." He then said, "now you can call the police," and walked to the living room to wait for the police to arrive.

### Procedural Background

Prior to trial, on July 20, 2011, the court appointed a psychologist to examine appellant. Clinical psychologist Carol J. Hendrix, Ph.D. thereafter examined appellant and submitted a report in which she opined appellant was competent to stand trial. On August 15, 2011, the court found appellant competent to stand trial.

5

On October 28, 2011, still prior to trial, appellant moved for an order appointing substitute counsel pursuant to *People v. Marsden* (1970) 2 Cal.3d 118, and the court conducted a hearing and denied the motion.

Trial was set for February 14, 2012. On that day, appellant moved again for an order appointing substitute counsel. The court conducted a hearing and denied the motion. During the hearing, appellant moved for an order that he be allowed to represent himself. The court also denied that motion.

On February 17, 2012, after the People had rested and appellant had begun testifying, defense counsel, outside the presence of the jury, moved for an order that appellant be examined by a psychologist to determine appellant's competency to stand trial, and the court granted the motion. Thereafter, Dr. Hendrix again examined appellant and prepared a report, and on February 21, 2012, following a hearing at which Dr. Hendrix testified that in her opinion appellant was "competent to stand court," the court found appellant "competent, … able to understand the nature of the criminal proceedings, and/or assist counsel in the conduct of a defense in a rational manner." The defense rested later that day.

## DISCUSSION

As indicated above, appellant submitted a letter in response to this court's invitation to submit additional briefing. In that letter, he referenced a previous letter he had sent to this court. We have reviewed both letters, and as best we can determine, appellant raises claims of ineffective assistance of counsel, judicial misconduct and prosecutorial misconduct, based on allegations of corruption and other malfeasance by trial counsel, the office of the Kern County District Attorney and members of the Kern County judiciary. The record contains no support for these claims. Accordingly, we reject them. (See *Denham v. Superior Court* (1970) 2 Cal.3d 557, 564 [appellant bears the burden of affirmatively showing error].)

6

Following independent review of the record, we have concluded that no reasonably arguable legal or factual issues exist.

## DISPOSITION

The judgment is affirmed.